Upshur et al. vs. Briscoe et als.

## No. 9103.

### ANNIE M. UPSHUR ET AL. VS. MARY E. BRISCOE ET ALS.

The decision of the Supreme Court of the United States, rendered since the original decree in this case, has settled the vexed question of the construction of the exemption from discharge in bankruptcy of debts contracted "while acting in a fiduciary character," and has held that such exemption only embraces technical trusts, such as those of executors, administrators and the like, and does not include trusts resulting from the relation of agents, commission merchants, etc. This reverses the former jurisprudence of this Court on this subject, and, the question being purely Federal in its character, we shall hereafter follow the decision of the highest Federal court.

An analysis of the instrument sued on in this case, satisfies us that the debt created thereby was not, under this construction, excluded from the discharge in bankruptcy.

Although a discharge in bankruptcy is ordinarily personal to the debtor, yet when discharged creditors attack the transactions of the bankrupt which took place after the discharge, his transferrees are entitled to the benefit of such discharge, and cannot be deprived thereof, when properly pleaded, by the failure of his collateral heirs, who are themselves estopped from attacking such transfer, to plead the discharge in their own defence. Such a case is not within the purview of Moyer vs. Dewey, 103 U. S. 101.

APPEAL from the Ninth District Court, Parish of Tensas, *Hough*, J.

*Wade R. Young* for Plaintiffs and Appellants.

*E. D. White, J. W. Montgomery* and *Steele & Garrett* for Defendants and Appellees.

*Julius Aroni* for the Heirs of Briscoe.

The opinion of the Court was delivered by

MANNING, J. The plaintiff Annie is the daughter of James Andrews and the widow of John B. Upshur. Her son and only child is co-plaintiff and is of age.

The defendant Mary is the childless widow of William J. Briscoe, and her co-defendants are his nieces and heirs at law, all married.

The action is based upon this paper-writing;—

STATE OF LOUISIANA, }
Parish of Tensas. }

Know all men by these presents, that I, James Andrews, of said Parish and State, do nominate, constitute and appoint William J. Briscoe, also, of said Parish and State, my true and lawful attorney for me and in my name, to pay or caused to be paid, to Annie M. Andrews the sum of $700 annually; said amount to be paid at the counting-house of some commission merchant or at some banking-house in the City of New Orleans, in equal, quarterly instalments of $175 each; said commission or banking-house, to be named and specified before the day of payment to the said W. J. Briscoe, and the said Annie M. Andrews,

subject to the conditions and restrictions, hereinafter enumerated, viz: The payments are to be regularly made as above set forth, according to the discretion of the said William J. Briscoe, of the general good conduct of the said Annie M. Andrews, which conduct must, in all respects, comport with the character and bearing of a discreet, prudent female.

The said William J. Briscoe being here present, accepts this appointment and trust, and binds himself to carry out the provisions of the same, according to its true intent and meaning, and I do further constitute and appoint the said William J. Briscoe, my attorney in fact, to have and receive the sum of $10,000, to he held by him for the benefit of the said Annie M. Andrews, subject to the conditions hereinafter enumerated, viz:

It is understood that the annual payments of $700, as above secured, shall be considered as interest upon the said amount of $10,000, and First, it is provided that in case the said Annie M. Andrews shall, hereafter, marry and leave issue, this amount of $10,000, shall remain invested as heretofore in the hands of the said William J. Briscoe, and the interest shall continue to be paid as heretofore mentioned; and in case of the death of the said Annie M. Andrews, such children, legal issue of her, shall become possessed of the above amount of $10,000, unconditionally, in full possession, to be paid by said William J. Briscoe. Second. It is provided, that in case of my death occurring before that of the said Annie, the above amount of $10,000, shall be placed unconditionally in her hands by the said William J. Briscoe, provided only she shall have no legal issue. In case, however, she shall at the time of my death have a child or children, legal issue of her body, then the provision heretofore enumerated, shall be strictly adhered to; and Third. It is provided that in case at the death of the said Annie M. Andrews without legal issue of her body surviving, then the above sum of $10,000, shall revert to me, my heirs or assigns.

Thus done and signed at St. Joseph in said Parish and State this 25th of January, 1857, in presence of Geo. W. Williams and Edgar D. Farrar, competent witnesses.

JAMES ANDREWS.

G. W. WILLIAMS,

E. D. FARRAR.

And now to these presents, also comes William J. Briscoe, who accepts this mandate in all its clauses, and binds himself faithfully to carry the same into effect, and the more effectually to secure the faithful performance of the same, he also binds himself as surety for the

said James Andrews, that the within mandate and all the stipulations therein contained, shall be well and faithfully executed and that the same shall be complied with in all its clauses. Thus done and signed at St. Joseph on the 25th day of January, 1857, in presence of G. W. Williams and Edgar D. Farrar.

Witness:                                        W. J. BRISCOE.

G. W. WILLIAMS,

E. D. FARRAR,

And at the same time and place, also came the said Annie M. Andrews, who hereby declares that she accepts the above in all its parts and clauses, ratifying and accepting the appointment of the said William J. Briscoe, as her trustee, and binding herself to confirm and abide by the above mandate in all its provisions. Thus done and signed at St. Joseph on the 26th day of January, 1857, in the presence of George W. Williams and Edgar D. Farrar.

Witnesses:                                   ANNIE M. ANDREWS.

G. W. WILLIAMS,

E. D. FARRAR.

Recorded in book of Wills and Donations.
Tensas Parish, February 18, 1857.

The payments of seven hundred dollars were annually made until the outbreak of the war between the States, the last regular payment in course having been made in January 1861. One other was made after the close of the war, viz in April 1867—none since that date.

James Andrews died in 1860. Briscoe married the defendant Mary in 1866, was adjudicated a bankrupt and was discharged in 1868, and died in 1880.

In 1857 when the above instrument was executed Mr. Briscoe owned a large and valuable plantation with its appurtenances which he had successfully cultivated many years. He was rich or had the appearance of wealth. Neither Andrews nor any other person in Tensas could have reason to suppose that this affluence would soon disappear. Andrews, pondering how he could best make sure provision for his daughter, entrusted Briscoe with the money set apart for her, and died before the crash came.

In October 1865 Briscoe mortgaged his plantation for $8,081.92, a compromise of a large ante-bellum debt, and in February 1866 executed another mortgage for fifty thousand dollars to Given, Watts & Co. and in April following a third mortgage to C. Fellows for $58,450.16. This last mortgage was also for ante-bellum debts, but the Given mort-

gage was made to enable him to operate his plantation. He did cultivate it through 1866 and 1867 with the disastrous results that have made those years memorable.

The year 1868 opened gloomily. Given, Watts, & Co, had made a surrender in bankruptcy, but prior thereto, as is asserted, they had transferred to Mrs. Mildred Gregory such of Briscoe's notes as had been consumed in his planting operations—three of them of ten thousand dollars each. Mrs. Gregory is the mother-in law of Given, and this transfer was made, as is charged, to pay her $4,000 that the firm owed her and $15,000 that the firm owed her daughter, Given's wife. Mrs. Gregory sued Briscoe on these notes in January, 1868, and foreclosed the mortgage and bought the property in March for twenty thousand dollars. In April Briscoe went into bankruptcy with $2000 of assets and $150,000 of debts. Briscoe and his wife staid on the place, he managing it as usual outwardly but under a power of attorney from Mrs. Gregory and with no salary. The supplies were sent in Mrs· Gregory's name by Given, and the advances in like manner, and both were charged to the Mound plantation. In November came the next event that seems to follow those already narrated inevitably, and which one could predict with absolute certainty.

Briscoe's wife sued him for separation of property in November. She had no estate. She was a house-keeper when Briscoe married her. Mrs. Gregory had given her a horse, so she alleged, and her husband had sold it for $250 and spent the money, and so she had judgment for that sum and for separation—the same oft-enacted farce.

Then Mrs. Gregory sold Mrs. Briscoe the plantation and all that was thereon for $4,517.83 cash and $25,000 credit extending through five years. This sale was made one month after the judgment of Mrs. Briscoe against her husband, when $250 was the sum total of her earthly possessions, and the realization of that was dependent upon executing her judgment against a man who had six months before surrendered everything in bankruptcy and had since been working without pay.

The planting operations of that year had been successful. In December when this sale was made there were in Given's hands $9,102.48 nett proceeds of the cultivation of that year, and which of course belonged to Mrs. Gregory if she were the real owner of the property. This sum was transferred after the sale to the credit of Mrs. Briscoe. The sale included the growing crop and all things else that had been adjudicated to Mrs. Gregory at the sheriff's sale.

The plantation was worked thereafter by Mrs. Briscoe as owner, her husband being her "manager" or agent. He died in 1880. This suit was instituted in 1881. Its object is to recover a judgment for the $10,000 and for each of the unpaid annual instalments, and to make it effective against the property, all the acts and doings by and through which the title has been finally vested in Mrs. Briscoe are attacked as fraudulent simulations, and a decree is prayed declaring the property to belong to Briscoe or his succession, and liable for this debt.

The case has been handled with signal ability by both sides. The defences are numerous—each in its turn hotly pressed—and the result below was a judgment for the plaintiff's against the Briscoe heirs for $700 annually from January, 1872, dismissing the demand for $10,000 as in case of non suit as prematurely made, and in favour of Mrs. Briscoe rejecting the claim against her and of course recognizing the property as hers.

The preliminary question meeting us at the threshold is the character of the obligation assumed by Briscoe, for if it be not fiduciary in the sense of the Congressional statute, his discharge in bankruptcy released him from compulsory liability for it.

It would be difficult to find a fuller creation of a trust than is there in terms set out. Briscoe is to pay Ann Andrews a fixed sum annually, to produce which a larger sum is put in his hands. The payment is not to be made unconditionally, but only if Ann's conduct is discreet and prudent, and of that Briscoe is to be the judge. His discretion alone controls him. If Ann shall marry and have issue, the trust continues, and when she dies her issue shall be unconditional owners of the fund, and the trust terminates. If Andrews dies before his daughter, she becomes unconditional owner provided she have no issue. If she have issue then, the trust remains as before provided. If Ann die before her father without issue surviving, the money must be returned to Andrews or to his heirs.

The terms used in Acts of Congress must be construed in the sense given them in the common law. They are framed by common-lawyers, have force and effect among and upon a people mainly governed by the common law, and are interpreted by Courts that expound and apply that system. Not a moment's doubt would be entertained by them that the word 'fiduciary' in the Bankrupt Act meant primarily and *par excellence* such obligation as was created by Andrews and accepted by Briscoe, and therefore the discharge of Briscoe in bankruptcy did not affect his liability for the obligation thus assumed by

him.  His own conception of the nature of the debt accords with this, since he entered it upon his schedule of debts as a ' trust.'

It is next urged that the settlement made by Andrews for the benefit of his daughter contains a substitution and *fidei commissum*, and therefore cannot be enforced.

The fund of $10,000 was not given to the daughter but only the usufruct thereof.  Nor was it given to Briscoe.  It was placed in his hands with the conditions that he should pay over the fruits of it to the daughter if her good conduct merited it, and should pay the fund itself to her issue surviving at her death.  It was a trust committed to his faithful care, the obligation of which he accepted, and promised to conform to the conditions imposed, and to carry out the purposes of the trustor.  For we must not be frightened by names.  The first court of this State said as early as 1827 that the object of the abolishment of substitutions and *fidei commissa* was well known to be to prevent property from being tied up for a length of time in the hands of individuals, and placed out of the reach of commerce, and that the framers of our Code certainly never contemplated to abolish naked trusts uncoupled with an interest which were to be executed immediately. Mathurin v. Livaudais, 5 Mart. N. S. 302.  And this was quoted and applied in Milne v. Milne, 17 La., 57, and repeatedly since.

There is no property tied up and put out of commerce by this settlement of Andrews upon his daughter and her children of a sum of money.  Groves v. Nutt, 13 Ann. 122; Suc. Michon, 30 Ann. 214.  Nor has it other indicia of a substitution.  It is not sufficient, says Marcadé, in order to create a substitution, that the donee shall be obliged to preserve the thing and to restore it.  There must needs be an obligation to preserve it until his death.  Thus substitution will not exist in a charge imposed upon a donee to preserve the thing given and deliver it to Paul at the end of ten years, or when he should become of age, or at any time other than the death of the donee.  *  *  *  Whenever a liberality is made with a charge to restore it at any other time than death, it is an ordinary *fidei commissum*, but not such as the law reprobates.  3 *Explication du Code Nap.* § 463.  And he goes on to explain that even when the liberality is made with a charge to preserve it until the death of the party charged with it, it will not be obnoxious if the charge is to transmit it to a determinate person, and especially when that person is the heir, for that would not interfere with the legal order of succession.  Ibid, No. 464.  Still further on he argues that it is not always a prohibited substitution when the charge is to

return the property to the donor, for *c'est un véritable retour et nonpas une substitution.* Ibid, No. 694. And in the light of his argument it may very well be that the last clause of Andrew's settlement—the condition that he shall receive back from Briscoe this money if his daughter shall die without heirs—would not be reprobated. But it is not necessary that we should make any ruling on that matter, since the event did not occur. That condition, if reprobated, may be excided, leaving all others and the donation subsisting. Marcadé, No. 694.

In this and kindred questions the true rule of construction is not to give effect to refinements for the purpose of so bending the instrument as to bring it within the terms of a prohibition, but rather to give effect and potency to its meaning and intent, whether or not the language used is in strict conformity to our own nomenclature.

The object and intent of Andrews was one that should be encouraged, not reprobated—to provide for his daughter through varying circumstances. Had he by any sort of donation given her the usufruct, and retained the naked property himself—or given it her for a term only or for life—the law would not have nullified it. He has merely interposed Briscoe, conveying him no interest, but imposing upon him a trust to do what is not forbidden by law, and the court must compel its execution whenever means are at hand available for the purpose.

It is obvious there are no means at hand if the transfer of ownership of the Mound Plantation to Mrs. Briscoe vests the title absolutely in her, but the successive steps by which that was done indicate unmistakeably the scheme, concocted by Given and Briscoe, to foil all other creditors of Briscoe save those whom Given chose to use as instruments to accomplish their purpose—if indeed the persons thus used were creditors at all. That Given owed his mother-in-law, Mrs. Gregory, four thousand dollars we are willing to believe. The alleged debt to his wife of fifteen thousand was manufactured for the occasion.

In order to make the plot effective it was essential that Briscoe should not own the plantation when he went into bankruptcy, and it was equally necessary that at its sale the nominal purchaser should be a tool of Given. The mortgage for fifty thousand dollars made to the Given firm, which did not represent nor secure a dollar of then existing debt, afforded the appliance that was needful to effect the transfer. The mortgage for fifty-six thousand dollars to Fellows, which was primed by the Given mortgage, was emasculated by the division of it into sixty notes transferred to different persons, each of whom was powerless to interfere. No one of them could make the small amount

of the note he held a basis for competition at the sale, and combination among them was impossible.

The Given firm had classed Briscoe as an ordinary debtor on their schedule in bankruptcy, and Mrs. Gregory as an ordinary creditor. The Given mortgage notes were kept in the background. When the time for action arrived Mrs. Gregory appeared as the owner of three of these notes of ten thousand dollars each, the other two never having been used, while at the sale under her executory process, the whole mortgage for fifty thousand dollars is still of record. No one would be rash enough to bid against the apparent holder of the mortgage, whose process had provoked the sale, and no one had an interest that could be protected but McLean whose ranking mortgage for $4517.87 alone stood in the way. He was quieted, and provision made for his debt as we shall see by-and-by.

Thus armed and equipped Given and Briscoe, under covert of Mrs. Gregory, proceeded to the consummation. The Given mortgage was foreclosed and Mrs. Gregory bought for twenty thousand dollars. We attach no importance to the price, and do not care whether it was a fair value or not. The only effect of a higher appraisement and a larger bid would have been to increase the sheriff's commissions. This sale was in March 1868. Throughout that year the operations of the place went on as before. Briscoe was there directing and guiding as before, but with a complaisance unusual to men who have been stript of all they had by that hard hand of the law which never strikes without evoking an angry growl from its victim, he not only staid and "overseed" but did it gratuitously.

The sale was of all his earthly possessions, even the house furniture ; for the more sweeping and all-embracing the sheriff's deed to Mrs. Gregory, the less would there be to go on Briscoe's list of property to be filed in the bankrupt court. And it was filed right on the heels of the sale –in the following month, so soon as the sheriff's deed, with its plausible and fair-seeming exterior, was spread on the public records to mock and falsify the doubts and surmises of incredulity.

The supplies sent to the plantation by Given were never thereafter marked with Briscoe's name, nor was the account kept with him. To have supposed that Given would neglect to make the marking of pork-barrels and the heading of his ledger conform to the requirements of the new situation, would be an injustice to his fertility of invention, and his sense of symmetry. Everything was done to produce verisimilitude. And as the year sped by and the gravid earth, gathering

its accumulated strength which two years of barrenness had but hus-
banded, burst its bosom and spread before delighted eyes the rich
spoils of an abundant harvest, the excellent judgment of Mr. Given
in advising his mother-in-law to this purchase was vindicated. The
year closed with a balance of over nine thousand dollars to the credit
of the plantation, but Mrs. Gregory was so obtuse in perceiving the
excellence of her bargain that she not only incontinently sold the
plantation but also transferred all its profits to Mrs. Briscoe so soon as
the latter could qualify herself for its purchase by a judgment of
separation of property, which be it remembered obtained no funds for
her wherewith to buy. The cash payment stipulated at this sale is the
exact amount of the McLean mortgage above mentioned, and it was
paid by the proceeds of the cotton raised on the plantation that year.
It was impossible that this sum should have been Mrs. Briscoe's under
any theory except that the plantation was worked in her interest, to
tide over the time when Mr. Briscoe's discharge from bankruptcy, and
her judgment of separation of property obtained, she would be in a
position to take the title. And such was the fact.

The surplus of over nine thousand dollars was carried to Mrs. Bris-
coe's credit precisely as if she had been the owner and cultivator of the
plantation all the year, it being reduced by the charge of McLean's
debt and payment of lawyer's fees for foreclosing the mortgage upon her
husband's plantation. Mrs. Gregory was merely a person interposed to
hold the title until this skillfully arranged plot could be slowly and
cautiously worked out. She took the title and passed it to Mrs. Briscoe
as an automaton, doing what she was bid by Given. She never saw
the place. She was told doubtless all these formalities were different
steps needful to realize her money, and Given no doubt thought he was
doing a good turn to Briscoe by screening from his creditors the fine
plantation, and doing an equally good turn to his own family by
hiding away from his own creditors over twenty thousand dollars for
his mother in law and wife. The evidence makes patent the scheme to
defraud Briscoe's creditors and to secure to Given's mother in law, or
through her to his wife, what these plaintiffs in the present suit had
the best right to.

From that time, December 1868, to Briscoe's death in 1880 the plan-
tation has been in Mrs. Briscoe's name and its operations enured osten-
sibly for her sole benefit, while really it has been Briscoe's property
in fact (not so considered by him) and his management, good judgment,
and skill have enabled him to pay the debt assumed to Mrs. Gregory.
Now that he is dead, and the trust accepted by him for the daughter of

Andrews has terminated, she and her son ask for its execution. We have said enough to shew that they are entitled to it. Heirs Casanova v. Acosta, 1 La. 186; Thibodeaux v. Herpin, 6 Ann. 676; Spurlock v. Mainer, 1 Ann. 302; Dennistoun v. Nutt, 2 Ann. 483; Suc. Ames, 33 Ann. 1331; Friedlander v. Brooks, 35 Ann. 741.

There remains for consideration what is now the exigible part of the trust fund. Prescription is pleaded. It is obvious it will begin to run from the time each payment became due unless some cause suspended it, or unless from the nature of the obligation prescription will not apply at all.

The primary condition imposed by Andrews and accepted by Briscoe was that the fund should remain in the latter's hand until the several events occurred which were to determine the final disposition of it. The plaintiff could not have demanded the principal sum until the event occurred which should terminate the trust. Provision was made for every contingency except the death of the trustee. The principal was not payable to the plaintiffs until after the death of Andrews and then only in the event of his daughter's marriage and birth of issue. Briscoe's death made the principal demandable from his succession, but the annual payments were demandable as they fell due, still prescription would not begin to run during the continuance of the trust nor until there was an unequivocal disavowal of it brought to the knowledge of the party entitled to it.

A payment was made in 1867, and in 1868 Briscoe regarded the relation as one of trust and so denominated it on his bankrupt schedule. In 1872 he offered Mrs. Upshur a compromise, tendering $250 annually and $2500 when he was able to pay that sum. This is the first disclaimer of the relation of trustee and marks the point of time when his functions as such ceased, and from which prescription may be reckoned. South. Mut. Ins. Co. v. Pike, 32 Ann. 488. The plea therefore bars recovery of the annual payment beyond ten years and consequently those accruing before January 1, 1872 are lost, and so the lower judge ruled, allowing interest upon each sum annually due from the day it became due.

The lower court dismissed the demand for the principal sum for prematurity. Why premature since Briscoe's death does not appear. If ever there can come a time when it was proper to demand the sum entrusted to him, it was at his death, and no time was lost in preferring the claim when that event occurred.

It is therefore ordered and decreed that the judgment of the lower court is reversed in these particulars;—that instead of rejecting the

plaintiffs' demand, the same is maintained, and the sales and conveyances by which Mildred Gregory received title to the Mound plantation and its appurtenances from the sheriff, and by which she afterwards conveyed title to Mary E. Briscoe, are annulled, cancelled, and set aside, and the property thus conveyed is declared to belong to the succession of William J. Briscoe and to be liable to the plaintiffs herein for the satisfaction of this judgment. And it is further ordered and decreed that the plaintiffs have and recover of the succession of said Briscoe seven hundred dollars with five per cent interest thereon from January 1, 1872, and the same sum with same interest from the first of January of each succeeding year until paid, and the further sum of ten thousand dollars and costs of this suit, and in other respects that the judgment be affirmed.

On Rehearing.

FENNER, J. The plaintiff is Annie M. Andrews, now the widow of John B. Upshur, and her son and only child, now of age, is co-plaintiff.

The defendant, Mary, is the childless widow of Wm. J. Briscoe, and her co-defendants are his legal heirs.

The action is based upon the following written instrument:

| JAMES ANDREWS | STATE OF LOUISIANA, |
| TO DONATION | |
| ANNIE M. ANDREWS, | Parish of Tensas. |

Know all men by these presents, that I, James Andrews, of said Parish and State, do nominate, constitute and appoint William J. Briscoe, also, of said Parish and State, my true and lawful attorney for me and in my name, to pay or caused to be paid, to Annie M. Andrews the sum of $700 annually; said amount to be paid at the counting-house of some commission merchant or at some banking-house in the City of New Orleans, in equal, quarterly instalments of $175 each; said commission or banking-house, to be named and specified before the day of payment to the said W. J. Briscoe, and the said Annie M. Andrews, subject to the conditions and restrictions, hereinafter enumerated, viz: The payments are to be regularly made as above set forth, according to the discretion of the said William J. Briscoe, of the general good conduct of the said Annie M. Andrews, which conduct must, in all respects, comport with the character and bearing of a discreet, prudent female.

The said William J. Briscoe being here present, accepts this appointment and trust, and binds himself to carry out the provisions of the same, according to its true intent and meaning, and I do further con-

stitute and appoint the said William J. Briscoe, my attorney in fact, to have and receive the sum of $10,000, to he held by him for the benefit of the said Annie M. Andrews, subject to the conditions hereinafter enumerated, viz:

It is understood that the annual payments of $700, as above secured, shall be considered as interest upon the said amount of $10,000, and First, it is provided that in case the said Annie M. Andrews shall, hereafter, marry and leave issue, this amount of $10,000, shall remain invested as heretofore in the hands of the said William J. Briscoe, and the interest shall continue to be paid as heretofore mentioned; and in case of the death of the said Annie M. Andrews, such children, legal issue of her, shall become possessed of the above amount of $10,000, unconditionally, in full possession, to be paid by said William J. Briscoe. Second. It is provided, that in case of my death occurring before that of the said Annie, the above amount of $10,000, shall be placed unconditionally in her hands by the said William J. Briscoe, provided only she shall have no legal issue. In case, however, she shall at the time of my death have a child or children, legal issue of her body, then the provision heretofore enumerated, shall be strictly adhered to; and Third. It is provided that in case at the death of the said Annie M. Andrews without legal issue of her body surviving, then the above sum of $10,000, shall revert to me, my heirs or assigns.

Thus done and signed at St. Joseph in said Parish and State this 25th of January, 1857, in presence of Geo. W. Williams and Edgar D. Farrar, competent witnesses.

JAMES ANDREWS.

G. W. WILLIAMS,

E. D. FARRAR.

And now to these presents, also comes William J. Briscoe, who accepts this mandate in all its clauses, and binds himself faithfully to carry the same into effect, and the more effectually to secure the faithful performance of the same, he also binds himself as surety for the said James Andrews, that the within mandate and all the stipulations therein contained, shall be well and faithfully executed and that the same shall be complied with in all its clauses. Thus done and signed at St. Joseph on the 26th day of January, 1857, in presence of G. W. Williams and Edgar D. Farrar.

Witness:                                        W. J. BRISCOE.

G. W. WILLIAMS,

E. D. FARRAR.

And at the same time and place, also came the said Annie M. Andrews, who hereby declares that she accepts the above in all its parts and clauses, ratifying and accepting the appointment of said William J. Briscoe, as her trustee, and binding herself to conform and abide by the above mandate in all its provisions. Thus done and signed at St. Joseph on the 26th day of January, 1857, in the presence of George W. Williams and Edgar D. Farrar.

Witnesses:                              ANNIE M. ANDREWS.
G. W. WILLIAMS,
E. D. FARRAR.

The objects of the action are: To recover judgment against the heirs or succession of Briscoe; to annul the title held Mrs. Briscoe to the Mound plantation, and to have said plantation declared to belong to the succession of Briscoe and to be subject to the satisfaction of the claim of plaintiffs. Various defenses are interposed, amongst others a plea of Briscoe's discharge in bankruptcy.

Since the rendition of our original opinion and decree herein, the Supreme Court of the United States has rendered its decision in the case of Hennequin vs. Clews, reported in 111 U. S. Reports, p. 680, which has altered our conclusions as to the effect of the discharge in bankruptcy.

Since the adoption of the Bankrupt Act of 1867, the State courts and the inferior Federal courts, have been divided upon the question as to the effect and true meaning of the 33rd Section of said act, which declares that "no debt created by the fraud or embezzlement of the bankrupt, or by his defalcation as a public officer, or while acting in any other fiduciary character, shall be discharged under this act." .

A similar clause in the earlier Bankrupt Act of 1841, though couched in different verbiage, had been construed to apply only to technical trusts, such as those of public officers, executors, administrators, guardians and trustees, and not to include the implied trusts resulting from the relations of agents, factors, commission merchants, etc. Chapman vs. Forsyth, 2 How., 202.

Some courts have taken the view, that the same limitations were applicable to the terms "fiduciary character" as used in the Act of 1867; while others, including this Court, have held that the language of the latter act, being conceived in broader terms, embraced agents, factors, etc., as persons "acting in a fiduciary character," within the meaning of the law.

This vexed question has now been definitely and authoritatively settled by the Supreme Court of the United States, in the recent decision referred to, which holds, in the sense of Chapman vs. Forsyth, that the terms only apply to technical trusts.

Thus the decisions of this Court in the cases of Benning vs. Bleakley, 27 Ann., 257 and Desobry vs. Tête, 31 Ann., 809, besides others, have been overruled by the Supreme Court of the United States, and, the question being purely federal, we must henceforth adopt the view of the latter tribunal.

We are now satisfied that, acting under our former jurisprudence, we gave too much weight to the *agency* declared in the instrument upon which this suit was brought as affecting the question of Briscoe's fiduciary character, whereas, under the decision just referred to, it is entitled to no weight whatever.

Nor is the term *trust*, as used in the instrument of greater weight; for the question, after all, is not whether the transaction is *called* a trust, but whether it *is* a trust within the meaning of the bankrupt act. Suppose an instrument of this kind to be presented: "'This witnesseth that A has this day delivered to B $10,000 in cash, upon the trust that he is to pay A interest thereon at the rate of seven *per cent* per annum, on the first day of January of each current year, and at the end of five years is to return to A the said sum of 10,000." Would anyone contend that such an instrument created a *trust* within the meaning of the bankrupt act, or was evidence of anything but an ordinary contract of loan?

Now a close analysis of the instrument here sued on reveals the following essential elements: That Andrews delivered to Briscoe $10,000, for which Briscoe obligated himself to pay seven per cent interest annually. This interest was to be paid to Annie M. Andrews, during her life or that of Briscoe, with the discretion, however, of withholding it from her in case of her improper deportment. But the obligation to pay the interest, was, nevertheless, absolute and unconditional, and if he judged Annie M. Andrews unworthy to receive it, it would have remained as a debt due to the ultimate beneficiary of the capital. This is apparent from the absence of any indication of a purpose to let Briscoe have the use of money without interest, and from the incongruity of construing otherwise the discretion confided to him of judging of her worthiness to receive it; for, if by deciding against the propriety of her conduct, he could absolve himself from the obligation of paying the interest at all, it would create an antagonism between his duty and his

interest, which could find no support in a rational interpretation of the writing. Therefore, we say, he was absolutely and unconditionally bound to pay interest on the money as long as he held it. This, unquestionably, implied the right to use the money and to use it as his own; for no authority is given to make particular investments of it for account of the beneficiary, and such investments would have been at his own exclusive risk; and, if unfortunate, however prudently made, they would have furnished him no excuse for non-payment of either principal or interest. It imposed the further obligation of returning the $10,000 (together, as we have shown, with any unpaid interest) to the beneficiary named, or to Briscoe or his heirs or assigns, in certain definite contingencies named and not necessary here to detail. Such is the plain import of the provisions of this so-called "trust."

In the language of the Supreme Court of the United States: "if the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed, all cases where the law implies an obligation from the trust imposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the act." Chapman vs. Forsyth, 2 How. 208. Such is precisely the character of the trust reposed in Briscoe—a trust simply in his "punctuality" and "integrity"—the same trust which lies at the base of every agency and of every loan or other credit. The fact that this trust is expressed in this instrument adds nothing to its nature, force, or effect. Had not the word "trust" been used, it would, nevertheless, have been implied in identical measure and strength.

The Supreme Court has held that a commission merchant who has made away with goods consigned to him by his customer, and failed to account for the proceeds, or a pledgee who has disposed of collaterals and failed to produce or account for them when his debt is paid, are not exempted from discharge under the terms of the act. *See cases above cited, and also* Neal vs. Clark, 95 U. S. 704; Wolf vs. Stix, 99 U. S. 1. It would be a mockery of reason to hold such debts subject to discharge, and exclude such an one as that of Briscoe. The commission merchant and pledgee, above alluded to, had committed acts of positive fraud and turpitude, punishable under the criminal statutes of this State. What has Briscoe done? He merely ventured the money

confided to him, as he had the right to do, and lost it as he ran the inevitable risk of doing. In failing to pay according to the obligation assumed, in the language of the U. S. Supreme Court, "he is not regarded as guilty of a breach of trust, but only of a breach of contract."

Indeed, considering the language of the act, which refers only to "debts created *while acting in a fiduciary character*," we incline to adopt the opinion of the Supreme Court of Massachusetts, "that the phrase implies a fiduciary relation existing previously to, or independent of, the particular transaction from which the debt arose." Cronan vs. Cutting, 104 Mass. 246. This would entirely exclude Briscoe's case, because all his obligations arose out of the very transaction which gave rise to the trust.

But, under every aspect of the case, considering the authoritative construction now placed upon the act, we conclude that Briscoe's debt was discharged by the bankruptcy.

It is urged, however, that, as the discharge in bankruptcy is not pleaded by the heirs of Briscoe, but only by his widow, whose title to the property sought to be subjected to the debt is herein attacked as a fraudulent simulation, the latter is not entitled to the benefit of such discharge which is personal to the bankrupt. The plaintiffs, in support of this proposition, rely upon the case of Moyer vs. Dewey, 103 U. S. 301. That case is differenced from this by two distinctions which destroy its application, viz : 1. The transfer of the property there attacked took place prior to the bankruptcy, while that here assailed arose subsequently thereto, so far as Mrs. Briscoe is concerned; 2. Judgments had been rendered against the debtor in that case subsequently to the bankruptcy although founded on debts existing prior to his discharge.

Thus the attacking creditors, in that case, were unquestioned creditors at the date of the transfer, and they remained creditors by subsequent judgment at the date of their suit. But here the transfer to Mrs. Briscoe took place after the discharge in bankruptcy at a time when the debts here sued on were barred and without revival by subsequent judgment. As we have held in the case of Scott vs. Castleman, decided this day, the heirs were estopped from attacking Mrs. Briscoe's title in their own right. We cannot admit that, by simply omitting to plead the discharge of their ancestor, they can turn loose upon Mrs. Briscoe the creditors of their ancestor, whose debts were barred at the time when she acquired her title. Mrs. Briscoe, deriving her title, as is alleged, from Briscoe, is entitled to the full benefit of the position in

which he stood at the date of transfer and to all the defenses resulting therefrom. She cannot be deprived of the benefit of his discharge in bankruptcy by the failure of his heirs to plead it, but is entitled to plead such discharge in her own defense.

This dispenses us from the necessity of reviewing our former decision on the merits of this controversy, and we content ourselves with the remark that all that was there said may be considered as not having been said.

The heirs who are sued as representatives of the succession of Briscoe, having failed to plead the discharge in bankruptcy, the personal judgment against the succession must stand, which, however, we understand to be of no moment, as its execution is restricted to the property of the succession which consists of *nulla bona.* And this, doubtless, is the reason why the plea has been omitted.

It is, therefore, ordered, adjudged, and decreed, that our former decree herein be revoked and set aside; and it is now ordered, adjudged, and decreed, that the judgment appealed from be amended so as to condemn the succession of Briscoe to pay to plaintiffs the sum of seven hundred dollars with five per cent interest from January 1, 1872, and the same sum with like interest for each succeeding year, and the further sum of ten thousand dollars and costs of suit; and that, in all other respects, including the limitations on said moneyed judgment, the same be now affirmed, plaintiffs and appellants to pay costs of this appeal.

### On Rehearing.

MANNING, J. As the organ of the court in Desobry v. Tete, 31 Ann. 819, after reciting the conflicting decisions of the State and U. S. Circuit courts upon the interpretation of the Bankrupt Act touching the discharge of fiduciary obligations, I said—"the words 'while acting in any fiduciary capacity,' employed in the act of 1867, will be construed in each State with reference to its own legislation, and the present contrariety of opinion will doubtless continue until a decision of the U. S. Supreme Court shall have definitively settled their interpretation."

Since the first opinion in this case was rendered in May of last year that court has definitely settled the interpretation of those words in the decision cited in the opinion just read. It is a federal question, and I accept the determination of it as binding.

But I have not the shadow of a doubt that the scheme for placing the title of this property in Mrs. Briscoe was concocted and carried out as detailed in the opinion I read on the first hearing of this case, and I can only deplore that the arm of the law which ought to be strong enough to shatter such schemes is made powerless by the shield thus imposed for their protection.